MOXIE NERVE FOOD CO. v. BAUMBACH and others.

(*Circuit Court, E. D. Texas.* July 11, 1887.)

1. TRADE-MARKS—INFRINGEMENT—BEVERAGE CONTAINING ALCOHOL.

Where, in an action for the infringement of the trade-mark of a beverage, it is sought to be shown in defense that the beverage contains alcohol, and the evidence shows that some chemists found a teaspoonful of alcohol in a quart, and others much less, and that it was used to cut the flavoring oils and mostly evaporated, the defense is not sustained.

2. SAME—SUIT BY LICENSER AGAINST STRANGER.

The owner of a trade-mark is not estopped from bringing suit to enjoin an infringement of it by the fact that he has made a third party his licensee for the territory in which the defendant carries on the business as to which the infringement is charged.

3. SAME—INJUNCTION TO RESTRAIN INFRINGEMENT.

In suit to enjoin an infringement on a trade-mark, it appeared that complainant, in 1885, owned and used a trade-mark, consisting of the word "Moxie," with a label containing a picture and descriptive words, in the sale of a certain beverage; that it also used a champagne bottle wrapped in a peculiar light brown paper, with the words "Moxie Nerve Food" printed prominently thereon; that after complainant had carried on business for some time, and acquired a large sale, defendant began to manufacture a preparation similar in taste, color, and flavor to that of plaintiff, and similarly put up in a champagne bottle, with a label and wrapper to deceive the general public, and bearing the words, "Standard Nerve Food," with the words, "Genuine. Beach and Claridge," written across the label. *Held*, that defendants would be enjoined from putting on the market for sale any packages or bottles of the style of champagne bottles in use by complainant, when such similar bottles contained a fluid resembling that manufactured and sold by complainant as Moxie nerve food, in taste, flavor, or appearance, and from using the words "Nerve Food," either alone or with other words, upon the outside or upon the wrapper of any package containing such a fluid.

4. CORPORATIONS—ORGANIZATION—NON-RESIDENTS.

Under Rev. St. Me. c. 48, § 16 *et seq.*, providing that "three or more persons may associate themselves together by written articles of agreement, for the purpose of forming a corporation to carry on any lawful business, including corporations for manufacturing," etc., and that "from the filing of the certificate of incorporation, duly certified as required by that act, the signers of such articles shall be a corporation, as if incorporated by a special act," etc., it is no defense to an action brought by such a manufacturing corporation, when it is shown that its office is located and its elections are carried on in the state where it is incorporated, and its annual return made to the secretary of such state, to allege that the incorporators were and are all residents of another state, and that it has not manufactured at all in its parent state, but carries on all its manufactures in another state.

Motion to Dissolve Injunction.

*C. Anson Jones, F. S. Burke,* and *Hutcheson, Currington & Sears,* for the motion.

*Scott & Levi,* opposed.

SABIN, J. In this case it would appear that Augustin Thompson, M. D., early in 1885, manufactured a beverage called by him "Moxie Nerve Food," and, deeming it of great value commercially, filed with the United States commissioner of patents an application for a trade-mark therefor on the sixteenth day of July, 1885, and which was afterwards registered

in the patent-office, September 8, 1885, and from which it appears that such trade-mark had only been in use since April 1, 1885; the term "Moxie," being the trade-mark word, while the label included a picture and other descriptive words. Thompson sold this trade-mark to complainant in July, 1885, and complainant has used the same as its trade-mark and label ever since. It also used the champagne bottle wrapped in a peculiar light-brown paper, with the words "Moxie Nerve Food" printed prominently thereon, as stated in the bill of complaint. It was in the full and undisputed use of its label, champagne bottle for its package, for quite a time, and the light brown wrapper, with words "Double Extract" or "Single Extract," as the case might be, of "Moxie Nerve Food," in prominent print thereon. It became quite popular and extensively used as an article of commerce under the head or class of "Beverages," and was generally known as "Moxie" or "Moxie Nerve Food." Its demand by the public was difficult to supply continuously in the same class of bottle; and it so happens that Dr. Thompson, the general manager of plaintiff, while he had used the common champagne bottle in making up his own and the complainant's packages, thereafter, having intended to put the same up in a different kind of bottle, with the words "Moxie Nerve Food" blown therein, had actually used such bottles in the business of plaintiff; but, being cautioned as to its effect upon plaintiff's trade-mark package, he desisted from so doing, and has since continued using solely the champagne bottle. The trade-mark asserts "that the Moxie nerve food contains not a drop of medicine, poison, stimulant, or alcohol, but is a simple sugar-cane like plant, grown near the equator and farther south; was lately accidentally discovered by Lieut. Moxie; and has proved itself to be the only harmless and effective nerve food known that can recover brain and nerve exhaustion," etc.

Shortly after the Moxie Nerve-Food Company got under full headway, quite a number of persons or nerve-food companies sprang up, claiming to manufacture or sell nerve-food *beverages*, and all manufacturing a beverage of the same or very similar taste, flavor, and odor to that of complainant; and as early as the fall of 1886 the defendant Baumbach and the Star Bottling Works, a corporation mainly belonging to him, were found manufacturing a preparation thus similar to complainants, and similarly put up in a champagne bottle, with the label and wrapper closely enough resembling the label or trade-mark and wrapper of plaintiff to deceive the ordinary public, and calling the same "Standard Nerve Food," and having the words, "Genuine. Beach and Claridge," written across the label. Such is the imitation of the Moxie nerve-food label, package, and wrapper that it is and was well calculated to deceive the general public, and impose upon the unwary, and derive advantage from the prestige of the Moxie nerve food, and such undoubtedly was the design in framing its label, and adopting the bottle and words "Nerve Food" thereon, and theretofore used by complainants in the manufacture and sale of its beverage. The words "Nerve Food" had never before been used upon beverages. It had been used very limitedly, indeed, upon some medicines put up in small bottles, and not widely known;

but still as a medicine the words "Nerve Food" had been used. The fluid or beverage, or preparation therefor, offered by defendants, is not enjoined. It is not objected to by complainant that defendants may put up a preparation like its own, or otherwise. But complainant does object, however, and desires to have enjoined, the putting up a fluid preparation as a beverage resembling its own in flavor, taste, and color, in *packages, wrappers, and labels or trade-marks like its own, or in such similitude as to lead the public to believe that they were buying the "Moxie Nerve Food," when in truth and in fact they were buying a preparation known as "Standard Nerve Food,"* and the contention is whether defendants have such right.

The complainant applied for and obtained an injunction, February 17, 1887, which was thereafter continued by the court, wherein it was ordered, adjudged, and decreed that the defendants, and each of them,— that is to say, August Baumbach and the Star Bottling Works, a corporation under the laws of Texas,—their and each of their servants, agents, attorneys, and employes, and all others confederating with them, be, and the same are and each of them is hereby, restrained and enjoined from in any manner simulating the trade-mark or label of complainant specified as Exhibit A in its bill of complaint, or using the same, and particularly the one specified in said bill of complainant as Exhibit B, upon *any bottle or package of fluid manufactured resembling in taste, flavor, or appearance the article of Moxie nerve food manufactured and sold by complainant under said trade-mark or label marked Exhibit A, as aforesaid;* and likewise from putting upon the market for sale, or using for making into packages or otherwise bottles, one or more of the style of champagne bottles in use by complainant, *when such similar bottles contain a fluid resembling that manufactured and sold by complainant as Moxie nerve food in taste, flavor, or appearance;* and likewise from using the words "Nerve Food," either alone or with other words, *upon the outside or upon the wrapper of any package containing the manufacture of a fluid resembling in taste, flavor, or appearance the article manufactured by complainants as "Moxie Nerve Food."*

It will be observed that the injunction did not in point of fact restrain defendants from manufacturing or selling the fluid preparation manufactured by them or any other. It did not restrain them from manufacturing or selling the same identical preparation as that manufactured and sold by complainant, nor does it now, but it restrains them from using the methods of complainant in presenting his preparation to the public for sale, or simulating the same so far as his trade-mark or label, champagne bottle, or wrapper, with the words "Nerve Food" thereon, is concerned. But it is now claimed by the defendants that the injunction ought to be dissolved because the plaintiff is not a corporation in point of fact, and because there never was such a person as Lieut. Moxie, and that the preparation of plaintiff contains alcohol, and is not manufactured from a sugar-cane like plant which grows near the equator and further south, and that the representations in reference to the same in the label are false, and calculated to mislead the public, and hence plaintiff ought not to be able to maintain this suit, or to have an injunction herein.

Either of the above objections, if well founded, would entitle the defendants herein to have the injunction dissolved.

The laws of Maine (chapter 48, Rev. St. 1883, § 16) provide that "three or more persons may associate themselves together by written articles of agreement, for the purpose of forming a corporation to carry on any lawful business, including corporations for manufacturing," etc. Sections 17 and 18 provide for the first meeting and other matters for the bringing of a corporation into actual existence. All the corporators were residents of the state of Massachusetts, and so signed themselves; one being a resident of Boston, Massachusetts, and the remaining seven of Lowell, Massachusetts, there being in all eight incorporators. The location of the corporation was at Portland, Cumberland county, in the state of Maine. John L. Hunt is stated as president, George A. Byam as treasurer, and John L. Hunt, Augustin Thompson, and George A. Byam are specified as directors, to whom the necessary oath was administered by M. L. GIBSON, justice of the peace; and on July 13, A. D. 1885, the attorney general, at his office in the state of Maine, "certifies that he has examined the foregoing certificate, and the same is properly drawn and signed, and is conformable to the constitution and laws," and which certificate is signed "ORVILLE D. BAKER, Attorney General." The certificate of incorporation so certified by the attorney general was recorded in the registry of deeds of Cumberland county, Maine, July 14, 1885, and was filed in the office of the secretary of state of Maine, July 22, 1885, and recorded volume 9, p. 11. Section 19 of the law above referred to, of the state of Maine, provides that, "*from the time of filing such certificate* in the secretary of state's office, the signers of said articles, and their successors and assigns, *shall be a corporation*, the same as if incorporated by a special act, with all the rights and powers, and subject to all the duties, obligations, and liabilities, provided by this chapter, and chapter 46. The certificate of corporation was filed by residents of Massachusetts, and so stating themselves to be, as required by law. Was it a corporation when so filed? That is the question; and I but follow the laws of Maine in declaring that, "from the time of filing such certificate in the secretary of state's office, the signers thereof were a corporation, and could sue and be sued by such corporate name. The name of such corporation was "Moxie Nerve-Food Company." "The purposes of said corporation are the manufacture of Moxie nerve food, and the purchasing, holding, and dealing in such real estate and personal property as may be deemed necessary and convenient in prosecuting said business, and to have and to exercise all the rights, powers, and privileges appertaining to such corporations under the general laws of the state of Maine."

But still it is now contended by defendants that it cannot sue in this state or elsewhere, and that it is no corporation, because its incorporators are non-residents of Maine, and do not now nor never have carried on the business of manufacturing anywhere in the state of Maine. The evidence shows that all its corporate acts are done in the state of Maine, but that it does not manufacture there, nor never has, but does so principally at Lowell, Massachusetts; but that it has sold its goods in

Maine, manufactured elsewhere, to citizens of Maine, and filled orders to its customers in Maine. If it had an existence in Maine, it can sue. It clearly had and has an existence in Maine. Whether it manufactures elsewhere in whole or in part is a matter purely between itself and the state of Maine. Maine, in its sovereign power, created it a citizen for all purposes of suit, as well as the business purposes declared in its certificate, and it is for her to deal with this person so far as its existence is concerned. It is the only power that can draw its existence in question when that existence has once been actually created. When that certificate was filed in the office of the secretary of state, it was a being, and it could have commenced the manufacture of Moxie nerve food at Portland, Maine, on that day, and it can do so now. It is a thing of life. It can sue and be sued. It can buy and sell. It can manufacture, and it can dispose of its manufactures. It could have sent to South America the day after filing its certificate for a ship-load of material for its manufacture, either in Maine or Massachusetts, and its purchase would have been good, and it can do so now. It may be contended that when the laws of Maine permitted three or more persons to associate themselves together for the organization of a corporation that they meant citizens of Maine. It may likewise be contended that when the law required the certificate to state, among other things, "the names and residences of the owners, the name of the county where it is located," that it was supposed that it would do all or a greater part of its manufacturing at that place, which is a very reasonable supposition. But suppose that, being fully organized for that purpose, it does not, but manufactures exclusively elsewhere, whose business is it? Is it not exclusively a matter between itself and its parent? I think that it is. When it sues in a court, the only question that the court can try is not whether it has disappointed the reasonable expectation of its creator or parent, but whether, in point of fact, such person or corporation has a legal existence? If it has, the suit must go on.

It is plain that the complainant did acquire the trade-mark and good-will of Dr. Augustin Thompson for the manufacture of Moxie nerve food, and that it still owns it, and that it may sue for any misappropriation or fraud upon it, or, as used by it on its manufactures, whether such manufactures are made by it in Maine, Massachusetts, or Texas. Of course a corporation cannot migrate and transact simply corporate business elsewhere. All its corporate acts must be transacted within the limits of the sovereignty which created it. By corporate acts, I mean the election of directors and other officers, the passing of resolutions, by-laws, etc.,—all these must be transacted in the state where the corporation is created in order to be valid. But such business as the manufacture of an article, the making of a contract through its agent elsewhere, the purchase and sale of commodities, may be done through its agent at any place which has no law contravening such action. Such acts are not corporate acts. I am asked to ignore the existence of this corporation, because thus far it has failed to manufacture Moxie nerve food in the state of Maine. I cannot do this. That is a matter that belongs to

the state of Maine. This corporation, according to the testimony, keeps its office with its clerk J. F. Chute at Portland, Maine, and holds its annual meetings there on the first day of January of each year; and its annual returns, showing its condition, are made to the secretary of state at Augusta, Maine,—all of which go to show that if the state of Maine has any right to draw in question the existence of this corporation, or to call for its forfeiture, yet that it is not such a matter as could be called in question either by a person having business relations with it, or one seeking to do it harm, or maraud on its right.

The claim of defendants that the Moxie nerve food contains alcohol I think is wholly unfounded, although it is true that one witness claims to have found a little more than a teaspoonful in one quart bottle, while others found very much less. It is admitted that alcohol is used to cut the flavoring oils, but it is proven that such alcohol passes off to a great extent, if not entirely, in the evaporation incident to its manufacture. It is also proved by a preponderance of testimony that the amount used in the flavoring is too little to be perceptible, while others claim—that is to say, some of the chemists state—that while chemically speaking it does contain alcohol, yet practically speaking it does not. I do not think that the charge of defendant that it contains alcohol is well founded. It is true that alcohol exists in many substances. I have heard it claimed that it existed in rain-water; and yet, even if it does, I suppose it would be practically true that rain-water contains no alcohol, there being no trace of it that is brought or capable of being brought to the senses by its use.

Again, it is also claimed by defendants that there never was such a person as Lieut. Moxie, and that it is not made from a sugar-cane like plant from the equator and further south; that these statements in the label are mere romances, to catch the popular eye; and that such representations are in fact false, and calculated to deceive and delude the public; and hence no claim can be set up by plaintiff for any invasion of its trade-mark upon the ground that no trade-mark will be allowed to cover a false allegation deceptive to the public. The fact that there was such a person as Lieut. Moxie, and likewise such a plant, is proved by Dr. Augustin Thompson; who also states that the plant, while in appearance has resemblance to sugar-cane, still that it has no saccharine matter in it, but that it has a bitter taste, and that the extract from the plant is of a watery character. The extracts of the chemists of the contents of the bottles show a palpable quantity of an extract of vegetable matter after all else has been spirited away by the action of the heat.

It is also claimed that the complainant cannot maintain this action by reason of having made J. J. Schott & Co. its licensee of the state of Texas and other sections, and of its contract with Schott & Co., but I do not think so. The fee to the trade-mark still remains in the complainant, and any injury to it will justify an injunction. The fact that Schott & Co. circulated an advertisement disclaiming the use of the champagne bottles for its packages of nerve food, the main body of which advertisement originated with complainant, is also claimed by defendants

as an additional reason why complainants cannot enjoin the champagne bottle. Schott & Co., while not disclaiming any responsibility that might attach to them from the acts of their employes, explain that such advertisement was a use of the same in ignorance of its contents, and by an employe who acted upon his own motion without their knowledge, and that they stopped the same upon first being made aware of it. However this may be, this use of the advertisement was not used or urged before me on the application for the injunction herein, neither was the fact adduced upon that occasion that the complainants herein had on one occasion used a bottle other than a champagne bottle, and with the name of "Moxie Nerve Food Company" blown in the bottle; neither does it now appear that the defendants August Baumbach, or the Star Bottling Works, knew any of those matters anterior to the granting of this injunction. It is true that it was shown upon that occasion that either plaintiff or Schott, or both, had on several occasions used beer bottles, and perhaps some other bottles other than champagne bottles; but they also showed that upon all such occasions there was printed prominently in red ink, on the wrappers of such other than Moxie bottles, an explanation as to why such bottle was used. Nothing was ever said or claimed as to the disclaimer in the advertisement of champagne bottles, now raised for the first time.

Dr. Thompson was and is the general manager of the complainant company, and it is plain to my mind that he at one time, and perhaps for several months, contemplated the use and adoption for the company's package a bottle other and different from a champagne bottle, and that the company used at one time such other and different bottle. But he claims and swears that he always adhered to the champagne bottle, and I have no doubt that he did. He claims that upon being advised that the use of this other bottle might impair his right or that of plaintiff to the champagne bottle, that he utterly disclaimed such other bottle, and adhered to the champagne bottle as a component part of plaintiff's package known to the world as "Moxie Nerve Food." The fact seems to be that whatever change, if any, or contemplated change, was made or attempted to be made in the style of bottle of plaintiff, the package used by plaintiff was known as the champagne bottle. It appears that the introduction of this beverage was with such bottle, and that it met with great popular favor, and that its sale was immense. And, whatever may have been said about nerve food, this company it seems was the first to bring it into use and prominence as a beverage; and the question naturally arises, how was it that all the other companies or persons which suddenly thereafter sprang up, with preparations resembling plaintiff's in flavor, taste, and appearance, should make *use of the champagne bottle* in putting their preparations upon the market? These various companies carried on their business of manufacturing at but small distances from each other. If others did not desire to advantage themselves by using the style of plaintiff's package, why did they use the champagne bottle? Is it not a little remarkable that all the manufacturers of other preparations used the champagne bottle after plaintiff had first used it in con-

nection with its own? The superinducing motives to the subsequent use by others of the term "Nerve Food" and the champagne bottle in putting up their various preparations, it is but fair to infer, were to simulate, 'as far as to each might seem wise, the package, methods of business, and trade-mark of the plaintiff herein.

Some of the labels exhibited in evidence to me were much closer imitations of plaintiff's label than the one complained of in this cause. Was such use of another bottle by plaintiff an abandonment of the champagne bottle as long as plaintiff still adhered to it? I was at first inclined to think that it was, but I am of opinion that it was not. The fact is, ideas are so quickly formed into methods, and methods into rights of property, that it does not require a long series of years to acquire a right from the use of a particular method, and when that method or right is once established it requires an abandonment before it is lost. In this case plaintiff first adopted and used the champagne bottle. It contemplated a change. It did use another bottle, but it never abandoned the champagne bottle, and, upon suggestion that its rights to the champagne bottle might be impaired, it abandoned the other bottle, and used and claimed the use of the champagne bottle. Had it created confusion in the mind of the public, or deceived the defendants herein as to the character of bottle used by it, it would have to be treated as an abandonment. The trade-mark was registered September 8, 1885, while the plaintiff company, for the manufacture of Moxie nerve food, was only organized but a few months anterior thereto, to-wit, July 22, 1885. It seems that the company was organized before the trade-mark was registered by Thompson, and this suit was filed February 5, 1887; so that it would seem that all these rights asserted and injuries complained of have accrued or arisen within a period of less than 19 months anterior to the filing of this suit. The contemporaneous use of the blown bottle must have been brief and limited, and, on mature reflection, I do not feel at liberty to regard the champagne bottle as having been abandoned by plaintiff, nor am I able to find either that confusion has been created in the public mind by the contemporaneous use of the blown bottle, or that these defendants were deceived thereby.

The trade-mark 'of complainants is simply the word "Moxie,"—that was the trade-mark registered,—to be used with the words "Nerve Food," and other words and descriptive matter. But "Moxie" was the trade-mark word. Had plaintiff, anterior to the alleged aggressions of defendants, acquired by use a right in the application of his label to champagne bottles, and their use in bottling his preparation, and the wrapper with the inscription "Moxie Nerve Food" thereon? Or, in other words, had the public come to understand that, if they desired to buy plaintiff's preparation, they would always find it in connection with trade-mark in a particular kind of package, except when the use of a different package was explained? I think this was the case, and that it was so understood by defendant Baumbach and the Star Bottling Works. And, again, I would inquire when particular words, or things of common use, or theretofore known and used by the public, are used

and appropriated by a party, in connection with his trade-mark upon a manufacture of an article of commerce, whether the use of such common terms or articles for similar packages by another party can be enjoined from use upon like or simulated preparations manufactured by such other party, bearing in part a similar but different name, but put up in such a manner as to delude an unwary consumer of the article? While it is clear that words or articles of common use could not be enjoined if used upon other preparations, yet, if used upon like or simulated preparations of same flavor, taste, and appearance, it seems to me that they can; and particularly when the first party using the same, in connection with his trade-mark and style of package, has established such a use of the same, and an intimacy between himself, it, and the public, as to become a matter of value by way of preventing deceit.

A champagne bottle, for instance, is a thing long and well-known by the public, and any person, under ordinary circumstances, may lawfully use the same in putting up any preparation therein.    But when a manufacturer of a hitherto unknown fluid or beverage, as an article of commerce, has a trade-mark therefor, and introduces such article of commerce to the public in a champagne bottle, with a particular kind of label or trade-mark affixed thereto, and the public becomes acquainted with it, and recognizes it in that form and style, and thereafter another party or manufacturer, finding such article to be in great demand, introduces an article of like taste, color, and appearance, claiming to be for similar use or purpose, and with a label sufficiently like the former, and of a character calculated to mislead the public, why, then, and in such case, I think that he might be and ought to be enjoined from embarrassing his neighbor and misleading the public by using a champagne bottle in putting up his preparation similar in taste, flavor, and appearance, and with similar designation of use or quality of article.

A man has a right to burn down his own house, or destroy his own property, or do with it as he pleases; but only so long as he does not burn or use it to the prejudice of his neighbor.   A man cannot set his own house on fire, either to recover insurance or to burn down or endanger the house of his neighbor.   There is room enough in the world for all, and so there are bottles and styles of packages enough for all; and if a man has an article which, either by accident or design, happens to have the same quality, and be entitled to the same descriptive class of goods, and of the same taste, flavor, and color, as another's, and, when used, is used in the same way, or is in imitation of another's article, and he finds that his neighbor is making money by vending such article of his own, why then, and in such case, let him use a different kind of bottle or package in placing his own preparation before the public, to the end that he may neither derive advantage over his neighbor, nor induce the public to buy one thing when they think that they are buying another.

The motion to dissolve the injunction in this case is refused, and an order will be entered to that effect.